Good morning, your honors. May it please the court, I am Julia Olson on behalf of River Runners for Wilderness et al. With the court's permission, I would like to reserve five minutes of my time for rebuttal. Good. Thank you. This case is about one of seven natural wonders of the world, the Grand Canyon, and the Colorado River flowing through it is its lifeblood. There are three reasons why the Park Service's decision to authorize motorized uses on the Colorado River is illegal. Number one, there is no need for motorized services. Number two, they are inconsistent with managing the river for its wilderness character. And number three, they impair the park's natural soundscape. First, under the Concessions Act, the agency never made the requisite determination that motorized services are necessary services to authorize before it authorized motor boats and helicopters to access the river. It only found that there was a general need for commercial guide services. While we agree that some people do need guide services to be able to access the Colorado River, those commercial services are available by non-motorized means to the same types of people and in as safe a manner as it would be on a motorized boat. The only time the agency really addressed the question of the need and appropriateness for motorized services was in its 1979 management plan. There, after studying this question for about a decade, the agency made a decision to prohibit motorized uses on the river. And the reason it did so... And they ran into that nasty beast, the Congress. Yes. Which we all have to deal with. They did. But that nasty beast of Congress only issued a one-year amendment to an appropriation bill that said they wouldn't give the park money if they enforced that management plan. That's what we call in Phoenix a two-by-four. Yes. But in that management plan, the evidence, the ten years of study that they did is still the only time they really took a hard look at the question and after doing so, they determined motorized services are unnecessary and that they're harmful to the wilderness character of the river. When the agency makes a necessity determination under the Concessions Act, it must do so under the mandates of the Organic Act, which is to conserve parks' resources and values. The question, therefore, that the park must have evaluated and never did is what kind of commercial services are necessary in order to provide a wilderness river experience for people? It isn't about providing any kind of experience on the river that people might like to have. It's about providing a wilderness river experience. We believe that this Court's interpretation of a very similar statutory provision under the Wilderness Act applies in the Blackwell case. Well, the Congress has not designated the river as wilderness, right? That's correct. And what we're about here is the regulations, et cetera, under which the Park Service operates operating it as if it were a wilderness area, right? That's correct. But those very regulations allow them to take into consideration prior non-conforming uses, don't they? No. In fact, the management policies at issue here are very specific. To manage the property as a wilderness, in the next words, are from the regulation to the extent that existing non-conforming conditions allow. That's in the regulation, isn't it? That is in the management policies. But the next sentence states that the agency will seek to remove from potential wilderness the temporary and non-conforming conditions that exist there. And it's critical here for the Court to recognize that when the agency did this 2006 management plan, it was doing so to reauthorize, to reissue brand new 10-year permits for commercial services. So at that point in time, it had the opportunity to make a different kind of decision. And what it did was reauthorize those motorized services on the river rather than making a decision to remove them from the river. So the agency was acting affirmatively. It wasn't failing to act to remove commercial motorized services. It acted affirmatively to allow them, which directly contradicts that general policy language that Your Honor quoted. But in addition to that general policy language, the Park Service mandates are very clear. If you read on further, it states that recreational uses in potential wilderness areas will provide outstanding opportunities for solitude or primitive and unconfined types of recreation, and they will preserve wilderness in an unimpaired condition. This case is all about watercraft, correct? That's well, and air travel on helicopters, too, which take commercial users off of the river and bring commercial users on to the river. One other point about that. My question was that there's other noise sources, aren't there, that are unaffected by this litigation? In terms of aircraft overflights, is that what Your Honor is referring to? Yes, the Park Service has found that the natural soundscape is already significantly degraded from some things that are outside of the Park's control. My question is, and tell me if I'm wrong, my understanding is that aircraft overflights, be it fixed-wing or helicopter, are not part of this lawsuit. They are not affected by the management plan. That is correct, yes. But what is affected, obviously, are the motorized uses of motor boats and helicopters. And again, the management policies specifically state that public use of motorized equipment or any form of mechanical transport will be prohibited in wilderness except as provided for in specific legislation. Now, when the management policies refer to the term wilderness, that includes potential wilderness, which is what the Colorado River is. And that is in Management Policy 6.3.1. It states, the policies apply regardless of category. So that prohibition on motorized services applies in potential wilderness. And the Park Service has never explained why its action to authorize those services complies with that policy provision. I'd like to add one thing back under the Concessions Act, and that is that if you look at the Management Policy 6.4.4, the Park Service jointly refers to the duty under the Concessions Act and under the Wilderness Act, refers to them as the same thing in terms of finding necessary and appropriate commercial services. This Court should hold the Park Service to the Management Policies prohibiting motorized services on the river for several reasons. First of all, the policies contain mandatory affirmative language. The regulations at 36 CFR 1.6 state that when issuing permits, the Park Service must comply with its Management Policies. And the FEIS and Record of Decision, in this case State of the Park, will comply with its Management Policies. And the Ninth Circuit, this Court has held in other cases that where an agency states it will comply with the policy, it's bound to do so, and it has the force of law. The Park Service here, prior to this FEIS and in this FEIS, has stated that motorized raft use is incompatible with the wilderness criteria of providing for those opportunities for solitude and primitive and unconfined types of recreation. The FEIS also concedes major adverse impacts to wilderness character and major adverse impacts to the wilderness experience. And the agency's evidence on that point has been the same since the 1970s. Was safety any part of the concern of the service in making the determinations it did? It wasn't. The agency has evidence in the record that demonstrates that whether you're rafting on a non-motorized boat or a motorized boat, there's the same level of safety. And, in fact, the fatality records on non-motorized craft are lower than fatality records. That's part of the record? That's part of the record. The agency's only real defense to this argument is that its decision does not preclude managing the river as wilderness at some point in the future, should Congress act on the wilderness recommendation. But that's only part of what the law requires. The Colorado River must be protected today for its wilderness values, not at some point in the future. You're down to under five minutes. You can use the time any way you wish. I don't mean to interrupt. I'd like to move on to discuss impairment a little bit. The Park Service has made conclusions about the natural soundscape in terms of stating it's a disappearing resource. They found significant adverse cumulative effects to it. They found major adverse impacts to the river experience because of impacts to the natural soundscape. And just to give you a couple of examples, in the lower gorge, you hear motorized noises 100% of the day, greater than 100% of the day. There are 60 motorboats on the river at any given time in the summer, and there are 40 helicopters that fly in and out of the river every day in the summer. They took a defeatist approach in managing the natural soundscape. They said that, well, this is just another incremental impact on top of an already very degraded soundscape, but that's illegal. They need to make a decision that takes into account all of the cumulative impacts to the soundscape, and they need to affirmatively act to protect it. I think I'll reserve the rest of my time. Thank you. Before you sit down, can I ask you a question? Yes. Have you been down the river? I have. How many times? Once. In a non-motorized craft? Yes. Okay. Thank you. Thank you. Do you have a question, Judge? No. We'll hear from the agency at this time. Good morning, Your Honors. May it please the Court, Charles Scott on behalf of the Park Service. You will also be hearing from counsel for two interveners in this case, one representing private boaters, the other outfitters. The plan that's currently... How are you going to divide your time? I am going to take 11 minutes of the time. Okay. The plan that's currently before the Court is the product of nine years of work by the Park Service to develop a management plan that increases access to the river for non-commercial users, reduces motorized use of the river, protects the river's values and resources, including wilderness character and natural soundscape, in fact, improves or lessens the impacts on those resources over the status quo. Furthermore, even though Congress has never acted to designate the Grand Canyon as wilderness, this plan does not in any way diminish the Grand Canyon's suitability for wilderness designation, nor does it preclude Congress from acting in the future, should Congress choose to do so. But only Congress has the authority to designate wilderness. Why are helicopters necessary? When you take a trip down the river, it's not as simple as saying, I'm going to pull my raft over and get in my car and leave. There are only a certain number of locations on this 277-mile corridor from which it's feasible to leave. You can hike up to the Grand Canyon village, or you can take a helicopter trip or be taken out of the canyon by helicopter at two locations, at the Whitmore Exchange, which is mile 226, I believe, and at Quartermaster Canyon, closer to Lake Mead. There is one point on the river, Diamond Creek, where there is a road, but there simply aren't that many places to get you back out of the canyon. And I'd like to mention that the helicopter flights being referenced are operated by the Hualapai Indian tribe. They occur exclusively on tribal land. There's actually a dispute between the Park Service and the tribe as to some of the park's boundaries. But while the EIS, the Environmental Impact Statement for this plan, does analyze the effects of the helicopters, the Park Service would not be able to step in and say, these uses must cease. Judge Hawkins, you asked whether this was not, whether these overflights were an issue that was not part of this litigation. They are not. In 1987, Congress passed a statute called the Grand Canyon Overflights Act. It's codified at 16 U.S.C. Section 1A-1. It directs the Park Service to make a recommendation on restoration of substantial natural quiet due to the effects of these ongoing overflights, but it makes FAA the agency responsible for implementing a plan to address them. The D.C. Circuit in 1998 upheld the Park Service's definition of restoration of natural quiet, but in 2002 it struck down FAA's existing plan. At the moment, FAA is revising the plan in accordance with the remand. The Park Service is working with the FAA on an Environmental Impact Statement related to overflights, but it is FAA that has the statutory responsibility to address this. I'd like to point out that that Grand Canyon Overflights Act also specifically says that the Park Service may not make a recommendation to stop the Hualapai Tribe from operating helicopters for the benefit of river passengers. Do you want to talk about the Concessions Act? Yes, Your Honor. An explicit finding was made in the EIS that commercial motorized services are necessary and appropriate. There's a reference to concessions, the necessity of concessions generally on page 278 of our excerpts of record. On page 225 of the supplemental excerpts provided by the intervener outfitters, the Park Service stated, the motorized trips provided by commercial outfitters, which enable thousands of people to experience the Colorado River in a relatively pristine and unconfined manner when many of them would otherwise be unable to do so, are necessary and appropriate for the public use and enjoyment of the park. The finding has explicitly been made. The appellants referred to Judge Hugg's decision in the High Sierra Hikers Association v. Blackwell case, which involved the Wilderness Act. The Wilderness Act generally prohibits commercial services, but does provide that they can be allowed to the extent that are necessary and proper to fulfill wilderness values. In analyzing that statutory language, Judge Hugg, you wrote, the statute does not define the term necessary. Therefore, I'm going to defer to the agency's determination that commercial pack stock services are necessary in wilderness. But you went on to say under the Wilderness Act, that's not enough, because it doesn't say necessary and proper. It says, to the extent necessary, and emphasized the word extent several times in the opinion. It's from that statutory text that the obligation to make a determination of the amount of a given commercial service is necessary and appropriate in wilderness. That provision does not exist in the Concessions Act, which is simply silent as to the necessity finding. In those circumstances, the court should defer to the agency's explanation, which is present in the record, of why commercial services are necessary, commercial motorized rafting concessions are necessary, to provide for the access of a wide range of users. You mentioned the power of Congress, Judge Hawkins. When the Park Service proposed to phase out motors in 1976 and 1980, Congress stepped in with an appropriations rider. In the legislative history for that bill, however, which is reproduced in pages 62 to 66 of our supplemental excerpts, Senators Hatch, Goldwater, Nunn, and Cannon all said, if you ban motorized rafting from the Grand Canyon, that will mean that it's only an opportunity available to those who have sufficient financial resources, sufficient free time, and the physical ability to do it. I'll point out that the average motorized trip down the Grand Canyon lasts eight days. The average non-commercial, non-motorized trip lasts 17 days. For me, that would use up the entirety of my annual vacation that I am given by the federal government. So considerations of time are not to be dismissed as irrelevant. So Congress, in making this determination, the legislative history reflects their belief that these services were necessary and appropriate, and the agency went ahead and made the finding on its own as well. It's justified in the record. If you felt that the Wilderness Act standard somehow was necessary, it was applicable, and that there had to be an explanation of the amount of services provided, that is provided within the analyses that the EIS makes. The amount of commercial motorized rafting is reduced. This is done to provide for additional opportunities for those seeking a wilderness, primitive recreation experience during certain months of the year, as well as to provide for increased non-commercial access and to meet management objectives on allowing a wide range of uses. The Park Service considered whether it could eliminate motorized rafting concessions, but determined that doing so would fail to meet the management objective that it identified in this plan of providing for a range of recreation opportunities for all visitors to the park. It would also fail to meet the environmentally preferred NEPA criterion of providing for the highest level of beneficial uses possible of the environment and providing for free choice and independent decision making on how to use it. This is 42 U.S.C. 4331. Do you agree safety is not a consideration? I believe that what the record demonstrates is that some people perceive motorized trips as being safer. I wouldn't – when you're taking a motorized trip, you're not faced with I'm going to hike out of the canyon or I'm going to be on the river for 17 days rowing in 120 degree heat. The studies do suggest that the two types of trip are probably equally safe, but the sociological findings do find – The opposing counsel says that the record reflects that the non-motorized are safer. I think that's what her statement was. What I'll do, Your Honor, is simply point you to the place in the record where I believe that the agency determined that they are equally safe. And that is – That sort of answers my question. It's not that – It's not an issue. It's really not a determinative issue. Why don't you move on to the next points you have. I'd like to address the management policies, please. What the management policies say is that the Park Service will not take any action that will diminish the wilderness suitability of a park and it will seek to eliminate those conditions that preclude wilderness designation. There is no diminishment of the wilderness suitability of the Grand Canyon. Should Congress at some point decide that it wants to designate the Grand Canyon as wilderness and eliminate motors, it could do so through legislation. Commercial motorized rafting, motorized rafting, has been going on since 1949, and if it hasn't diminished the suitability of the park for wilderness designation yet, it won't do so in the future, especially now that the levels are being reduced. Nor does the existence of motorized – of motorboats even preclude designation. Section 4D1 of the Wilderness Act specifically recognizes that such uses were well-established and this has been going on since 1949, may be allowed to continue subject to such limitations as the Secretary finds desirable. The management policies repeat this language in Section 6.4.3. There is no violation of the management policies standards on wilderness character. I would like to add that, of course, the Park Service abides by its own management policies. We're not arguing anything different. But those policies are not judicially enforceable under this Court's test in Eclectus-Parrots, repeated in a number of cases involving agency handbooks. In the Western Radio Services Company v. Espy case that we cite in our brief, the Court specifically addressed the argument that incorporation of a handbook by reference in a regulation made the handbook also enforceable. On pages 901 to 902 of that opinion, the Court rejected that argument. Nor is this a case of a NEPA claim where someone is saying your EIS says one thing and you're doing another, therefore, your EIS is misleading, as your opinion, Judge Fletcher, in Ecology Center v. Austin held. There is no NEPA claim at issue here. The Park Service has complied with the management policies, but they are not enforceable by third parties against the Park Service. And with that, I will leave time to the interveners, unless there are questions. I don't see any. Thank you. Thank you. There's about four minutes. Which intervener is up first? May it please the Court, my name is Lori Potter, and I represent the Grand Canyon Private Voters Association, a non-profit membership organization whose mission is advocating for access to the Grand Canyon for non-commercial voters and advocating the interests of non-commercial voters in management of the canyon. Unlike the typical environmental case, this case is not one that is a zero-sum game. This is not a case in which the species survives or the species goes extinct, the forest lives or the forest is clear-cut. Instead, this is a case where the decision of the agency has given the appellants a substantial amount of what they were looking for, and the context of the decision leaves appellants and the American public in a much better situation than they were before. And I want to go through those three reasons, because I think they point to why the agency appropriately exercised its discretion. One, appellants have achieved the zero motor condition in the Grand Canyon for more than half of every year. One can go on a wilderness motor-free trip for six and a half months of every year. Two, not only did the decision of the agency result in a motor-free Grand Canyon for most of every year, the conditions of concern to the appellants are improving three ways. One, the motorless season is longer than it was before this decision. It was formerly a three-month motorless season. Now it's six and a half months of wilderness-type conditions. Two, the private voter allocation, the non-commercial allocation, is much larger. It was about a 70-30 split. Now it is approximately even. And finally, motors are quieter. The record shows that over time motors have gotten significantly quieter and are less of an impediment to one's enjoyment of a trip through the Grand Canyon. Third reason why the agency's decision leaves appellants and the American public in a much better condition than it was before this decision was made is that not only are conditions improving, but appellants and the public get another bite at the apple, maybe more than one more bite at the apple of this very set of issues. One, this is a ten-year plan, a ten-year management plan. We're three years into it. In seven years, appellants can advocate for their interests once again. They haven't lost these issues for all time. Finally, as Council for the Park Service said, Congress is still free to designate this area as wilderness at any time. All parties agree in this case on one thing, and that is that the noise of motors is a temporary or transient impact. It goes away, and it does not impair the suitability of these areas for designation. Let's say some time for Mr. Kalin. I shall. That was my last point. Thank you. Thank you. Thank you, Your Honor. May it please the Court. My name is Sam Kalin, and I represent the Grand Canyon River Operators Association. I'll just make up just a little bit, and I'll make a brief remark unless the Court has any questions. Go ahead. The one issue that I wanted to address is this notion about the wilderness experience today. And as you just heard, there is a wilderness experience that does occur during the canyon. It just doesn't occur during the entire period. And what we're talking about is whether or not the law requires a wilderness experience to exist throughout the entire period. And one issue that you heard from the appellants was, and I see my time is going to be up. Can I just? Okay. Is that this is really a potential wilderness area right now. The question is, even assuming these management policies were binding, the question is, what do they mean? The Park Service is entitled to our deference, as this Court knows, in interpreting whether it's regulations or things like that. And as I think the Court just recently indicated in the Siskiyou case just a month ago. So the question is, what do those management policies really mean? And what we're talking about is this concept of potential wilderness. And I think there's some misunderstanding about what that term means. Potential wilderness does not exist in the Wilderness Act. It's not a statutorily defined term. What it is is it's a term of art that Congress uses when it designates areas as wilderness. It also may say that they are potential wilderness. And when nonconforming uses are removed, then it can become a wilderness area. There's no suggestion that this area is now considered a potential wilderness as designated by Congress, number one. Number two, there has never been a recommendation by the President to Congress for any kind of designation as a potential wilderness as well. So I think that we need to be clear when we're talking about what this area really is right now, that we understand that the critical issue is making sure that whatever happens in the future, that there's no impairment of the potential for suitability for inclusion into the wilderness system if in fact the President receives a recommendation and then transmits that to Congress and the record is fairly consistent throughout time, both during the Clinton administration, as the lower court indicated, and more recently in this administration, or in the past administration, that their belief is that there is no impairment, that the use of motorized rafts will not impair the potential suitability for inclusion in the river system. Thank you, Your Honor. I appreciate the extra minute. Rebuttal? Counsel? Ms. Olson? Thank you. Just a couple of points. With respect to the natural soundscape, I wanted to point out that some of the overflights and tours are in fact authorized by the Park Service. That's at Excerpts of Record 353. And the fact is the natural soundscape is going extinct. It's not a species, it's less tangible than physical, biological resources, but it is going extinct, and it's one of the primary reasons people go to the Grand Canyon, is to experience the natural soundscape. And the Park Service has an affirmative duty to protect it and prevent its impairment. With respect to the Concessions Act, counsel for the Park Service cited to you a page in the Excerpts of Record that is actually a response to comments as the necessity determination. There's no analysis in that response to comments. It's merely a conclusory statement. With respect to amount of commercial services that are necessary, the Concessions Act specifically states that commercial services must be limited to those that are necessary. You cannot limit a commercial service without stating an amount that you're going to limit it to.  Counsel also argued that motorized trips are necessary because people may not have time to take 17 days to do a non-motorized trip. The Park Service never made a finding that that requires commercial services, first of all, and they were required to do that if that was going to be their basis for a necessity finding. When you say commercial, you mean motorized? I'm sorry, yes, commercial motorized services. But there are opportunities for shorter trips down the Colorado River. You can start at Lee's Ferry and you can float to Phantom Ranch in about 7 or 8 days, which is the same length of time as a motorized commercial trip. Under the management policies, the Park Service does not recognize an established use exception that exists in the Wilderness Act for the Forest Service specifically and the Department of Agriculture. So that is irrelevant here. I want to respond for a moment to Counsel for the Intervenors' arguments about equity and fair access. She suggested that this plan is an improvement for the public, but the law doesn't require a mere improvement. The law requires equity and access. And we think that the public should have an equal opportunity to take a non-commercial trip down the river as they should to take a commercial trip if, in fact, they need those commercial services. So there should be equitable allocation. Without a demand study or any analysis of that issue, the agency has no rational basis for its allocations here. And frankly, if access were truly equitable right now, then the concessioners would have no problem switching the seasons of use. So let's have the non-motorized season be in the summer instead of in the winter. There's clearly inequity in the system. And I'm out of time, so I'll stop there. Thank you. Thank you for your argument. The water's still cold summer or winter, right? Thank you very much for your arguments. It's a very interesting and complex and important case, and it's submitted for decision. And the Court will stand in recess for the day.
judges: Hug, Fletcher B. , Hawkins